

BENJAMIN BONNELL,

    Plaintiff,

v.                           Civil Action No. 3:19-cv-008

COL. ROBERT R. BEACH, *et al.*,

    Defendants.

### MEMORANDUM OPINION

This matter is before the Court on Defendants Col. Robert R. Beach ("Beach") and Rachel S. Whitehead's ("Whitehead") MOTION FOR SUMMARY JUDGMENT (ECF No. 45). Because Beach is no longer a party to this case, the Court will deny as moot the motion with respect to Beach. For the reasons set forth below, the motion with respect to Whitehead will be denied.

## I. BACKGROUND

This case arises out of a physical altercation that occurred, on February 2, 2018, between Benjamin Bonnell ("Bonnell") and Ieuan Phillips ("Phillips") in a dormitory at Longwood University, a state-owned and -operated university. After that altercation and based on a Criminal Complaint filed by Whitehead, Bonnell was charged in state court with felony malicious wounding under Va. Code § 18.2-51 (the "malicious wounding statute"). This charge

terminated shortly thereafter in Bonnell's favor by *nolle prosequi*.

Whitehead is employed as a member of Longwood University Police Department. It is undisputed that, at all relevant times, Whitehead was acting under color of state law and in the course of her employment as a Longwood University Police Officer.

Proceeding in federal court pursuant to 42 U.S.C. § 1983,[1] Bonnell alleges in COUNT I that Whitehead violated his right, under the Fourth Amendment to the United States Constitution, to be free from an unreasonable seizure by maliciously swearing out a Criminal Complaint seeking Bonnell's arrest for the crime of malicious wounding (said to be a violation of Va. Code § 18.2-51) and thereby maliciously securing his arrest and prosecution. In COUNT II, Bonnell alleges that Beach defamed him. (ECF No. 1.) On August 6, 2019, Whitehead and Beach filed a MOTION FOR SUMMARY JUDGMENT (ECF No. 45), which is the subject of this opinion. That same day, the Court denied Whitehead's motion to dismiss and granted Beach's motion to dismiss less than two weeks later. (ECF No. 44; ECF No. 49.)

---

[1] Section 1983 confers no substantive rights. Rather, it provides a procedural vehicle for pursuing in federal court a claim for a violation of a federal constitutional or statutory right by one acting under color of state law. Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 615-18 (1979).

2

The parties have taken discovery. The record on this Motion consists of declarations from Whitehead, Beach, and R. Stuart Raybold; various exhibits, including primarily written witness statements, body camera footage, photographs, emails, written reports regarding the altercation, and the Criminal Complaint; and cited deposition testimony offered by each side. There are some undisputed facts, but there are some genuine disputes of material fact. It is thus necessary to outline the general factual circumstances that gave rise to the case, and, in so doing, to accord Bonnell the benefit of all reasonable inferences. And, because of the nature of the claim in COUNT I, it is necessary to understand the statements that the witnesses gave to Whitehead before she swore out the Criminal Complaint charging Bonnell with malicious wounding.

According to the summary judgment record, there were two witnesses (Phillips and Bonnell) who actually participated in the altercation, and one witness, another Longwood student, Carie Sutliff ("Sutliff"), who saw it.[2] The following general recitation of facts is taken largely from the evidence given by those witnesses with firsthand knowledge.

---

[2]     Later, Whitehead suggested that there may have been two other witnesses, but the summary judgment record contains nothing from them. And, in any event, even now, we do not know what they saw if, indeed, they saw anything.

3

## A.    The Altercation

The events giving rise to this case arise out of interactions
between Bonnell and Phillips, who at the time were suitemates at
Longwood.    (ECF No. 63 at ¶¶ 4-5.)    On February 2, 2018, Phillips
and Bonnell had bickered throughout the day.    The altercation at
the core of this case ensued after the latest exchange of words.
Following that exchange, Sutliff directed Bonnell to "cool off" in
her suite.    (ECF No. 51-12 at 1.)    Bonnell followed that advice
and left Phillips behind at the suite that the two shared.

While walking with Sutliff toward her room and away from
Phillips, Bonnell told Sutliff that he "[s]ometimes . . . wish[ed
he] could throw a bottle at his [Phillip's] head."    (Id.)    Phillips
said that, although he heard Bonnell say "something" to Sutliff,
he "didn't know what [Bonnell] said."    (ECF No. 51-11 at 1.)
Phillips, who is much bigger than Bonnell, then pursued Bonnell
into Sutliff's suite, "push[ing Sutliff] out of the way to get to
[Bonnell]."    (ECF No. 51-12 at 1.)    That much is not disputed.
Nor is it disputed that, after Phillips cornered Bonnell in
Sutliff's suite, Bonnell and Phillips continued to argue loudly
and in close quarters in Sutliff's suite.

During her investigation, Whitehead received information
about what happened next.    There was some conflict between Phillips
and Bonnell's views about who engaged in what posturing once

4

Phillips entered Sutliff's suite.[3] However, considering all of the evidence given by the three witnesses with firsthand knowledge (and, according Bonnell the benefit of all reasonable references), it seems clear that Whitehead had conclusive evidence that Phillips was the aggressor in the altercation that ensued in Sutliff's suite.[4] The record also shows that Whitehead had conclusive evidence that Phillips initiated physical contact with Bonnell by putting his left hand on Bonnell's neck, picking him up, and pushing him into a closet where Bonnell's head struck a sharp object and was cut. (ECF No. 51-11 at 1; ECF No. 51-10 at 1-2.)

Whitehead was also aware, and Phillips' witness statement confirms, that he "picked [Bonnell] up by the neck" and "slammed [him] into the closet." (ECF No. 51-10 at 1; ECF No. 51-11 at 1.) She also knew that, as a result, Bonnell's head hit a metal clothing bar, which cut his head and caused significant bleeding. (ECF No. 51-10 at 1-2.) Phillips himself concedes that he "used [his] left hand and pushed [Bonnell] into the locker around the neck still holding him there" before "[throwing] him to the ground." (ECF No. 51-11 at 1.) It is undisputed that Phillips

---

[3]    (See ECF No. 51-11 at 1 (Phillips' witness statement explaining that Bonnell "came at [him] and squared up"); ECF No. 51-10 at 1 (Bonnell's witness statement explaining that Phillips "began pushing himself into [Bonnell]").)

[4]    On the whole the record shows that Phillips and Bonnell quarreled; that Bonnell withdrew and went to Sutliff's suite; and that Phillips followed and pushed Sutliff aside to get to Bonnell.

then picked Bonnell off the floor and again threw him to the ground.

According to Phillips, while Bonnell was on the ground, he picked up a bottle and threw it at Phillips. Phillips ducked, and the bottle struck Sutliff on the side of her head. (ECF No. 51-10 at 1-2; ECF No. 51-11 at 1-2; ECF No. 51-12 at 1-2.) Indeed, there is no real dispute that Whitehead knew that, when Bonnell threw the bottle, he was on the ground or trying to get up after having been violently attacked by Phillips, a much larger man.[5]

In many cases the extent of Sutliff's injuries ordinarily would not play much of a role in the probable cause determination, but it is pertinent to the analysis in this case because an element of malicious wounding is the intent to permanently maim, disfigure, or disable. Sutliff's injury is also pertinent for the additional reasons that: (1) Sutliff did not seek medical care for her injuries, (upon the advice of her mother who is a nurse); and (2) contrary to the assertion by Whitehead in the Criminal Complaint, none of the witnesses stated that Sutliff blacked out or had a "large hole" in her head. (See, e.g., ECF No. 51-12 at 2 (Sutliff's written statement explaining that she "started bleeding from the

---

[5]    (ECF No. 51-10 at 1 (Bonnell's written statement that he threw bottle "[w]hile [he] was trying to get up"); ECF No. 51-11 at 1 (Phillips' written statement that Bonnell threw it "[w]hen he was on the ground"); ECF No. 51-12 at 1 (Sutliff's statement that Bonnell threw bottle "as he was getting up, in the fight").)

6

split in [her] head"); ECF No. 51-10 (not stating that Sutliff blacked out); ECF No. 51-11 (same).) Indeed, in her Incident Report, Whitehead did not claim that Sutliff blacked out and described Sutliff's head wound as a "large gash," not a "hole in her head." (ECF No. 51-6 at 3.) Nonetheless, in the Criminal Complaint, Whitehead told the Magistrate that Sutliff "has a large hole in the back side of her skull" and that Sutliff had "black[ed] out" when the bottle hit her. (ECF No. 51-13 at 1.) In thusly reciting the nature of Sutliff's wound, Whitehead offered a statement addressed to the specific intent element of malicious wounding (with intent to permanently maim, disfigure, disable, or kill).[6]

Also, there is credible evidence that, at the outset of her investigation, Whitehead jumped to the conclusion that Bonnell had committed the crime of malicious wounding based largely, if not solely, on a photograph of Sutliff's wound. And, she did that, even though, immediately before doing so, Sutliff had told Whitehead that the wound did not require stitches and that this medical advice had come from Sutliff's mother, a practicing hospital nurse, who had seen the picture of the cut.

---

[6]    Va. Code § 18.2-51 does not contain the word "permanently," but, as explained *infra* (at pp. 31-32), Virginia law is clear that the intent element requires intent to permanently maim, disable or disfigure.

Thus, the evidence about the nature of Sutliff's wound is pertinent to: (1) assessing the validity of what Whitehead said in the Criminal Complaint about the specific intent element of the crime of malicious wounding; and (2) determining whether Whitehead intentionally or with reckless disregard for the truth told the Magistrate that Sutliff had a "hole in the back side of her skull" and had "blacked out" when the record shows clearly that no such evidence was known to Whitehead when she swore out the Criminal Complaint.

## B.    The Investigation

Whitehead's investigation of the altercation between Phillips and Bonnell began three days after the fact because none of the people involved called the Longwood Police Department on the evening of February 2 when it occurred, a fact that would suggest to Whitehead that neither Bonnell, Phillips, nor Sutliff considered the events to be serious. In fact, the record shows that the Longwood Police Department was called by the building custodial service after one of Sutliff's suite members called that service to get dried blood off the floor.

According to the record on summary judgment, Whitehead interviewed Sutliff, Phillips, and Bonnell in that order.[7]  Those

---

[7]    Madison Lantz ("Lantz") was also interviewed when Sutliff was interviewed.    Lantz had no knowledge of the altercation between Phillips and Bonnell, but, afterward, she helped Sutliff wash the

interviews were recorded on a body camera that Whitehead wore.[8] On February 6, 2018, Sutliff, Phillips, and Bonnell gave witness statements. These video and written statements constituted the evidence from those with firsthand knowledge that was known to Whitehead when she filled out the Criminal Complaint, at least insofar as the summary judgment record is concerned.[9] It is thus necessary fully to appreciate what those recorded interviews and witness statements made known to Whitehead.

### 1. Interviews of Sutliff, Phillips, and Bonnell: Body Camera

The following is a summary of what the recorded interviews show:

---

wound and took a photograph of it. She also drove Bonnell to the hospital the next morning.

[8] Bonnell argues that the recordings show that Whitehead, from the outset, was not seeking the truth, but, instead, was intent on charging Bonnell with malicious wounding. That is a disputed fact issue for the jury to resolve.

[9] Attached to Whitehead's motion for summary judgment is an affidavit (Whitehead's married name is Giuriceo), (ECF No. 46-1). In it, Whitehead summarized the interview with Phillips. The video recording of that interview will be considered, not Whitehead's summary in that affidavit. Whitehead also says that she spoke off-the-record with Sutliff and Lantz, but she reports no substance at all, just that the conversation occurred.

Whitehead filed another affidavit (ECF No. 69-1) in response to a motion *in limine*. There she says that, before February 9, she spoke with a resident advisor, Michael Carpenter, and Donnie Redd. Again, Whitehead reports no substance. And, the affidavit is not part of the summary judgment record. It will not be considered.

### (a) Interview of Sutliff

During the interview, Sutliff described the incident, telling Whitehead, in pertinent part:

> [T]hey started fighting over there and one of them [Bonnell] ended up bleeding because they [Bonnell] hit their head. **And then one of them [Bonnell] was trying to stop the other one [Phillips], so they [Bonnell] threw something.** And instead of hitting the other person, they [Bonnell] hit me in the head. And . . . it hit me over here on the side of the head and it kind of split my head open a little bit. And I went in there and I was holding my head and I was like, "God, my head really hurts," and then I pulled my arm down. It was covered in blood. So I started freaking out. And then they took me into the bathroom – she did [pointing to Lantz]. And she tried to wash off some of the blood to see where it was coming from and stuff. And then to get, like, the light on it, she – I, like, laid down right over here, and that's why it's all sticky over there.

(See ECF No. 51-7 ("BWC Video 1") at 00:50–01:35; ECF No. 46-5 ("Trans. BWC Video 1") at 2:10–25 (emphasis added).)[10]  Later in the interview, when asked why Bonnell threw the bottle, Sutliff stated:

> [O]ne of them [Phillips] was bigger than the other [Bonnell]. And, I mean, the smaller guy knew what he was getting himself into when it started. But, like, obviously, the bigger guy's going to do a little bit more damage.

---

[10]  The bracketed names for the person referred to by Sutliff as "they" are supplied from the context and by the references Sutliff made in the video recording.

> So, like, he was slinging him every . . . which
> way.

(See BWC Video 1 at 07:18-07:29; Trans. BWC Video 1 at 16:8-14.)

When asked about her injury, Sutliff said that she had called her mother, who is a nurse, and (using Facetime) showed the injury to her mother. (See BWC Video 1 at 02:11-02:42.) Sutliff's mother advised her not to go to the hospital. (See id.) Further, Sutliff described her injury as "it wasn't that big," "it already healed a lot," and "it had already stopped bleeding for the most part." (See id.)

The video recording shows that, at this point, Whitehead stated, "this is malicious wounding" and "this is a felony," a statement that she later repeated during the interview. (See id. at 03:05-03:10, 15:15-15:18.) When Officer Hardy (who accompanied Whitehead) described the injury as "you got a good-sized gash," Sutliff responded, "you can look at it now[;] it is pretty much cleared up." (See id. at 03:17-03:22.) And, later Sutliff again stated that her injury "wasn't . . . bleeding that bad," "I didn't need stitches," and "my head's fine now." (See id. at 05:07-05:22; Trans. BWC Video 1 at 10:25-11:3, 11:16-17.)[11]

The recorded interview with Sutliff and Lantz also shows that Whitehead was advised that Bonnell was injured; that Lantz took

---

[11]    At no point did Sutliff state that she had lost consciousness or blacked out.

him to the hospital; and that he had a slight concussion and needed staples, but that it was too late to apply them. (See BWC Video 1 at 04:39-04:55; Trans. BWC Video 1 at 9:21-10:10.) Lantz then showed Whitehead a picture of Bonnell's injuries that showed a wound to his head. (See BWC Video 1 at 04:55-04:57.) Later, Whitehead described Bonnell as the "boy with big gash in his head." (See id. at 09:30-09:32; Trans. BWC Video 1 at 21:13-14.)

### (b) Interview with Phillips

Immediately after her interview with Sutliff and Lantz, Whitehead interviewed Phillips. (See BWC Video 1 at 17:00.) During that recorded interview, Phillips described the incident, stating in pertinent part:

> I overheard him in the hallways. He said something about me. He said my name. So **I went outside** in the hallway and **I confronted him** – or, I tried to, and **he went into the room** who you just spoke to, Carie and Madison. And **I went into their room** and I was like, "Ben, what'd you say?" And then he came, like, straight up at me and, like, started chesting me up. He was like, "You want to start this right here, right now?" And I was like "Ben, what did you say?" That's the only reason why I went over there, just to see what he said. And again, he was persistent on fighting. So I did – **I put my hands on him**, he put – he pushed me back, and **I picked him up and threw him on the ground. And then after that, he had a bottle and he tried to hit me with it and I ducked.** And that's when he hit the other girl in the . . . head.

(Id. 17:25-18:08; Trans. BWC Video 1, 40:25-41:17 (emphasis added).)

12

### (c)   Interview with Bonnell

Whitehead then went to interview Bonnell.  She met Bonnell and asked him for his student identification.  (See ECF No. 51-1 ("Whitehead Dep.") at 34:17-22; ECF No. 51-8 ("BWC Video 2").) Seconds after meeting Bonnell, and when he went back into the room to get his student identification, Whitehead told Officer Hardy "[h]e is getting ready to lie.  You see that look on his face?" (BWC Video 2 at 00:58-01:02; ECF No. 46-6 ("Trans. BWC Video 2") at 2:7-8.)[12]

During his recorded interview, Bonnell told Whitehead:

> So at about I guess 10:00 that night, I was in the girls' suite down the hall hanging out with them.  My former roommate had come in so we all went back to my room to see him.  And I don't remember what we were arguing over. But at that point, Ieaun [Phillips] and I **started bickering** over something. . . . I left after that and **walked back down the hall with the girls,** went back to their room, heard him yelling after me.  **He came into the suite.  I walked up to him to talk to him.  He started pushing up against me.  That point, he picked me up and slammed me into one of the girl's closets.  My head hit the metal clothing bar there.  Picked me up again, slammed me onto the floor.  At that point, I picked up a bottle to defend myself.**  I guess that came out of my hand at some point and hit Carie [Sutliff], one of the girls.

(BWC Video 2 at 01:44-02:44; Trans. BWC Video 2 at 2:17-3:7 (emphasis added).)  Later in the interview Bonnell repeated:  "I

---

[12]   Whatever prompted Whitehead to pass this judgment is not evident on the video recording.

was trying to defend myself at that point. I mean, he was hurting me." (BWC Video 2 at 11:01-11:06; Trans. BWC Video 2 at 12:2-3.)

After Bonnell gave his description of the incident, Whitehead told Bonnell that his description was inconsistent with what Phillips had said (saying erroneously that Phillips had asserted that Bonnell put his hands on him first). (See BWC Video 2 at 03:10-03:34, 08:33-08:38; Trans. BWC Video 2 at 3:14-22.) Bonnell explained:

> [O]ne of the girls tried to stop him coming into the suite. He pushed her out of the way. I was just standing there when he started pushing up on me. It wasn't a fight I wanted to happen. That's why I left my room in the first place. And, I mean, I never would've gotten physical with him.

(BWC Video 2 at 03:39-03:55; Trans. BWC Video 2 at 3:24-4:5.) And again, with the investigation still incomplete, Whitehead can be heard reiterating that Bonnell had committed malicious wounding, a felony, the conclusion on which she had fastened early in the interview with Sutliff. (See BCW Video 2 at 04:20-04:25, 06:29-06:30; Trans. BWC Video 2 at 4:15-17.)

### 2. Written Statements of Sutliff, Phillips, and Bonnell

On February 6, the investigation into the altercation continued. Whitehead secured written statements from Sutliff, Phillips, and Bonnell. Each is set out verbatim below.

14

### (a)  Sutliff Statement

Throughout the day they had both been bickering to each other.  After their friend Peter got off the elevator they kept talking to each other rudely.  Ben was walking to my room and told me 'sometimes I wish I could throw a bottle at his (Ieuan) head.'  At this point, I told him to go in my suite alone to cool off.  I was still in the hall and Ieuan came storming down the hall saying 'what was that bitch' reffering [sic] to Ben.  **I tried to stop him from coming in and he pushed me out of the way to get to Ben.  As they saw each other the fight broke out.  During the fight Ieuan had slammed Ben and as he was getting up, in the fight, Ben took the bottle of Maddog and threw the bottle** to hit Ieuan but it came across the room to hit me instead when Ieuan had ducked to miss it.  The bottle had hit me on the right side of my head.  The bottle hit the ground and I started bleeding from the split in my head.

(ECF No. 51-12 at 1-2 (emphasis added).)

### (b)  Phillips Statement

Ben said something about me in the hallway going into 702 but at the time I didn't know what he said.  So I followed him into the 702 suit [sic] to ask him about what he had said about me at the time.  Once I entered the suit [sic] I repeatedly keep asking 'Ben what did you say?' Before I entered room 702 Ben came at me and squared up and repeatedly asked me if I wanted to fight and if I wanted to fight right now.  I asked one more time before he repeated what he said previously, still squaring up.  **Once he said the comments again I used my left hand and pushed Ben into the locker around the neck still holding him there.  Once I did that he then put his hands around my neck leaving marks and some blood.  When I felt the pain I grabbed Ben and threw him to the ground. His head hit the ground and was cut.  When he was on the ground he picked**

**up the bottle next to him** and attempted to throw it at me. Once I saw him in action to throw the bottle at me I then ducked. Once I ducked the bottle went passed [sic] me and hit Carie in the head. After that we went our separate ways. I stayed behind to help Carie any way I could and Ben went home. I later found out that night that Ben told the people in the suit [sic] that if he was to find an empty bottle he would smash it against my head.

(ECF No. 51-11 at 1-2 (emphasis added).)

### (c) Bonnell Statement

On Feb. 2nd I had been hanging out with friends in the room down the hall. We went back to my room to meet my former roommate who was in town for the weekend. While in my room I went to talk to Ieuan my suitemate. We began arguing. I as well as the girls and Peter left. I heard Ieuan yelling after me. I re-entered the suite area because we had walked in. **He began pushing himself into me and the [sic] picked me up by the neck, slammed me into the closet and my head hit the metal clothing bar. He picked me up again by the legs and slammed me onto the ground. While I was trying to get up I picked up a glass bottle** to defend myself which came out of my hand and hit Carie Sutliff. The fight diffused at that point, and I returned to my room after someone said I had a cut on the back of my head. I returned to the suite to get my phone and saw Carie and her suitemates in the bathroom and asked if she was okay. Her suitemates asked me to leave. So I called a friend in Fraiser to stay there the night. I later returned to get medication from my room and briefly talked to Carie. I had Madison and her friend take her to the ER the next morning, then headed home for the weekend.

(ECF No. 51-10 at 1-2 (emphasis added).)

### 3. The Report of the Resident Advisor

In addition to the video interviews of, and written statements made by, the three people with firsthand knowledge, before February 9 when she filed the Criminal Complaint, Whitehead had received, but not read,[13] a report from Michael Carpenter, the Resident Advisor ("RA") for the dormitory.

Carpenter also interviewed Bonnell, Phillips, and Sutliff in that order. Carpenter issued a report on February 5, 2018. Because Whitehead did not read the RA's report before she filed the Criminal Complaint, she cannot have considered its contents, and thus it could not have been part of her probable cause determination. Nonetheless, the RA's report can be considered as evidence that, had Whitehead considered it, it would have been material to an assessment of: (1) the credibility of Bonnell, Phillips, and Sutliff; and (2) whether there was probable cause to support the elements of the crime of malicious wounding, which, as of February 6 (and early in her investigation), Whitehead appears to have decided was a crime that Bonnell had committed.

Carpenter's report of the interviews is set out below.

#### (a) Report of Interview with Bonnell

> Resident Bonnell claimed that on the night of
> Friday, February 2, Resident Bonnell and

---

[13] The motion for summary judgment was argued on the first day of the Final Pretrial Conference, and there was follow-up on the second day. Whitehead's counsel represented that Whitehead had received, but had not read, the RA's report before February 9.

Resident Phillips had gotten into a heated discussion and Resident Bonnell made a comment under his breath while entering the suite of Resident Carie Sutliff (L00399074, Curry 704). Resident **Phillips then asked Resident Bonnell in a heated manner** 'what did you say?' While in the suite of Curry 702/704/706, Resident **Phillips then picked up Resident Bonnell and slammed the head on the door,** which then caused **Resident Bonnell to bleed from the back of the head.** Resident **Phillips** then, while still holding Resident Bonnell, **slammed** Resident **Bonnell on the ground,** causing the resident to hit his head on the ground. Resident Bonnell then **attempted to use a glass bottle to defend against** Resident Phillips.

(ECF No. 51-3 at 1-2 (emphasis added).)

### (b)  Report of Interview with Phillips

Resident Phillips informed RA Carpenter that both Resident Phillips and Resident Bonnell had been bickering and Resident Bonnell said a statement in the 7th floor hallway in which was inaudible to Resident Phillips. Resident Phillips then asked 'what did you say?' while **following Resident Bonnell into the suite** of 702/704/706. Resident Phillips asked Resident Bonnell 'what did you say?' Resident Phillips was then challenged by Resident Bonnell who had been saying, 'do you want to start this?' Resident Phillips then stated, 'I just want to know what you said.' Resident Bonnell said in reply, 'let's do this now.' Resident Bonnell then squared up to Resident Phillips. **Resident Phillips then put the hands of the resident on the neck of Resident Bonnell. Resident Bonnell then also put his hands on Resident Phillip's [sic] neck.** Resident Phillips then picked up Resident **Bonnell and 'threw him on the ground.'** Resident Bonnell then **grabbed** a **bottle and attempted to throw it at Resident Phillips** but Resident Phillips ducked and Resident Sutliff was hit.

(Id. at 2 (emphasis added).)

18

### (c) Report of Interview with Sutliff

Resident Sutliff stated that the conflict began down the hall with an exchange of words. Resident Sutliff advised Resident Bonnell to 'cool down' in Resident Sutliff's room. While **walking to Resident Sutliff's room, Resident Bonnell muttered under the resident's breath 'I wish I could throw this bottle at you.'** Resident Phillips then became angry and asked 'what did you just say?' Resident Bonnell then **entered the suite** of 702/704/706 as Resident **Sutliff then attempted to prevent Resident Phillips from entering the suite but was pushed out of the way** by Resident Phillips. Resident Phillips then approached Resident Bonnell and asked angrily 'what did you say?' The exchange then intensified and Resident **[Phillips] then picked up Resident Bonnell and slammed Resident Bonnell against the door of room 702. Resident Phillips then slammed Resident Bonnell's body and head on the floor.** Following, Resident Phillips then picked up Resident **Bonnell, who was laying on the floor motionless,** and 'hugged him and tried to grab for his neck' as claimed by Resident Sutliff and Lantz. Resident **Bonnell then picked up a glass bottle to try to hit** Resident **[Phillips] with to escape.** Resident Bonnell then slipped the bottle and hit Resident Sutliff instead. Resident Sutliff then bled, as well as Resident Bonnell.

(Id. at 3 (emphasis added).)

This then is the record from those with firsthand knowledge of the incident and the evidence that was known to Whitehead when she filed the Criminal Complaint.[14]

---

[14] During the Final Pretrial Conference, while discussing objections to evidence that she intended to offer at trial, Whitehead's counsel identified other (non-recorded) interviews of Phillips, Bonnell, and Sutliff that were made on February 6 when the witnesses came in to give their written statements. In this discussion, Whitehead, for the first time, said that Sutliff had

### 4. The Incident Report

Whitehead completed an Incident Report (ECF No. 51-6) on February 6. It appears that Whitehead took the Incident Report with her to visit the Commonwealth's Attorney and the Magistrate to file the Criminal Complaint. In pertinent part, Whitehead's Incident Report says:

> Carie [Sutliff] states that on Friday night, February 2, she and her suite mates were hanging out with some friends. Two males from the same hall came into their suite and were arguing. Carie states that these two have been having personal issues since school started. She advised that Benjamin Bonnell was in the hall area of her suite and Ieuan Phillips came in to speak with him. After some arguing and chest thumping, a physical altercation ensued. Phillips shoved Bonnell off of him and Bonnell continued to get in Phillips [sic] face. Phillips slammed Bonnell down on the floor cutting his head open. As Phillips tried to leave the room, Bonnell picked up an alcohol bottle and threw it missing Phillips, and striking Carie in the back of the head. Both Carie and Bonnell were bleeding heavily from their heads.
>
> * * *
>
> Carie had a pretty large gash in her head but refused stitches for fear that they would shave her head. She went home to let her mother who is a nurse check it out the next morning. Madison [Lantz] took Bonnell to the ER to have his head checked. He had a mild concussion and a laceration that was not

---

used the phrase "when I came to," a phrase used as the predicate for Whitehead's assertion in the Criminal Complaint that the bottle "caus[ed] her [Sutliff] to black out." (ECF No. 51-13 at 1; see also ECF No. 70 at ¶ 5.) That statement, however, is not part of the record on summary judgment.

stitched due to the amount of time that had passed.

* * *

I spoke with Ieuan Phillips in his room and he advised that he and Bonnell had not been getting along and that on Friday night he heard Bonnell talking about him in the hallway and went out to see what he said. He saw Bonnell enter the girls [sic] suite and went to confront him. He stated that once he got in the room Bonnell immediately jumped in his face hitting him with his chest saying he would fight him. He says that he just kept asking him what he had said about him. Bonnell proceeded to get in his face and swing at him so he picked him up and basically slammed him down on the floor causing him to hit his head. Phillips stated that he was attempting to leave the girls [sic] room when Bonnell threw the bottle hitting Carie in the head.

* * *

Bonnell states he was in the girls [sic] room and that Phillips came in unprovoked and jumped in his face. He stated that he tried to back up and Phillips body slammed him twice hitting his head on the closet. He got up, grabbed the bottle and attempted to throw it at Phillips but hit Carie instead.

(ECF No. 51-6 at 3.) The summary judgment record does not reflect how much, if any, of the Incident Report was shared with the Magistrate. Nor is any reference made to it in the Criminal Complaint the Magistrate signed. It is, however, significant that the Incident Report is considerably different than what the witnesses told Whitehead. For example, Phillips told Whitehead that he initiated physical contact whereas Whitehead says that Bonnell did. (Compare ECF No. 51-11 and Trans. BCW Video 1 at

21

40:25-41:15, with ECF No. 51-6 at 3.) Also, the Incident Report says that "[a]s Phillips tried to leave the room, Bonnell picked up an alcohol bottle and threw it." (ECF No. 51-6 at 3.) No one, not even Phillips, said that Bonnell threw the bottle as Phillips was leaving the room. Later in the report Whitehead repeats that statement, attributing it to Phillips. Id.

### 5. The Criminal Complaint

In filing the Criminal Complaint, Whitehead initiated the allegedly malicious prosecution that is the predicate for COUNT I.

The Criminal Complaint stated in full:

> Accused was involved in a physical altercation with a suite-mate. During the altercation, accused was thrown to the ground and upon standing he grabbed a glass liquor bottle. He threw this bottle at the subject he was fighting but missed him, striking a nearby female in the head causing her to black out. Female has a large hole in the back side of her skull. Minutes before the altercation started, the accused told the female that was hit that he "wished he could throw a bottle @ his head" referring to the subject he was involved in the altercation with.

(ECF No. 46-14 at 3.)

### C. Whitehead's Response

Whitehead's affidavit in support of summary judgment repeats the version of events that she recites in the Incident Report. (ECF No. 46-1.) Thus, she insists that Phillips told her that Bonnell initiated the physical fight. And, Whitehead offers an affidavit from her supervisor, R. Stuart Raybold, who avers that

22

Whitehead "provided a full recitation of all statements given by participants and witnesses to this incident to the Assistant Commonwealth's Attorney, including Bonnell's statements." (ECF No. 46-3 at ¶ 11.) In sum, Whitehead contends that she accurately summarized in the Criminal Complaint what she had been told by the witnesses. Whitehead also included with her motion the various witness statements. And, it is fair to say that she denied making in the Criminal Complaint any misrepresentations or omitting any material information.

Whitehead's summary judgment motion must be decided in perspective of this record.

## II. SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court may only enter summary judgment if "there [is] no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (internal quotation marks omitted).

When reviewing a motion for summary judgment, a court must interpret the facts and any inferences it draws from them in the light most favorable to the nonmoving party. See Matsushita Elec.

23

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Lee v. Town of Seaboard, 863 F.3d 323, 327 (4th Cir. 2017). To successfully oppose a motion for summary judgment, the nonmoving party must show that there are specific facts that create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). However, "[c]onclusory or speculative allegations do not suffice to oppose a properly supported motion for summary judgment, nor does a mere scintilla of evidence." Matherly v. Andrews, 859 F.3d 264, 280 (4th Cir. 2017) (quoting Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002)) (internal quotation marks omitted). Consequently, summary judgment is appropriate where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party . . . ." United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991).

## III. BONNELL'S COMPLAINT AND WHITEHEAD'S THEORIES OF SUMMARY JUDGMENT

### A. Bonnell's Complaint

#### 1. The Claim in COUNT I

The gravamen of COUNT I in Bonnell's Complaint is that:

> Whitehead instituted criminal proceedings against Plaintiff, wholly without probable cause, upon false, incomplete, and misdirected information provided to the Assistant Commonwealth [sic] Attorney and Magistrate, with actual malice, reckless disregard for

24

> Plaintiff's rights, and intent to injure
> Plaintiff.

(ECF No. 1 at ¶ 2.) Also, the Complaint charges that Whitehead made false statements in the Criminal Complaint. (<u>Id.</u> at ¶ 48.) And, later it is alleged that Whitehead "purposefully concealed important and material facts regarding the incident, including, but not limited to, Mr. Bonnell's actions in self-defense . . . ." (<u>Id.</u> at ¶ 67.) All of these assertions are made in support of COUNT I.

The allegedly false statements contained within the Criminal Complaint include:

> (1)  that Bonnell was standing when he threw the bottle;
>
> (2)  that Sutliff blacked out; and
>
> (3)  that Sutliff had a "large hole in the back side of her skull."

(ECF No. 1 at ¶ 48.) The alleged omitted material information was that:

> (1)  Phillips, who was considerably larger than Bonnell, was, according to all the evidence (except Phillips' statement) the aggressor in the altercation (he followed Bonnell into Sutliff's suite and pushed her aside to get to Bonnell);
>
> (2)  Phillips initiated the physical contact between the two;
>
> (3)  that, when Bonnell was "laying on the floor motionless," Phillips picked him up by his legs and threw him to the floor again;

(4)     Phillips confirmed that Bonnell was "on
        the ground" when Bonnell "picked up the
        bottle next to him and attempted to throw
        it at [Phillips];" and

(5) Bonnell was injured by Phillips.

(See ECF No. 51 at 10-11, 28.)

### 2.  **Bonnell's Burden**

To prevail on COUNT I, Bonnell must prove, by a preponderance
of the evidence, that Whitehead "(1) caused (2) a
seizure . . . pursuant to legal process unsupported by probable
cause, and (3) criminal proceedings terminated in [his] favor."
Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012). And, where,
as here, the plaintiff's claim is that the warrant was procured by
misrepresentation or omission, Bonnell must also prove that
"[Whitehead] deliberately or with a 'reckless disregard for the
truth' made material false statements in [her] affidavit [the
equivalent of a Criminal Complaint] or omitted from that affidavit
'material facts with the intent to make, or with reckless disregard
of whether they thereby made, the affidavit [Criminal Complaint]
misleading.'" Miller v. Prince George's Cty., 475 F.3d 621, 627
(4th Cir. 2007) (quoting Franks v. Delaware, 438 U.S. 154, 171
(1978); United States v. Colkley, 899 F.2d 297, 300 (4th Cir.
1990)) (internal citations omitted).

In this context, the plaintiff must do more than show that
the decision to include or "not to include certain information in

26

the affidavit" was deliberate.  Colkley, 899 F.2d at 300.  Instead, to prove that the officer acted deliberately or with a reckless disregard for the truth, Bonnell must show that Whitehead made false statements or omissions that were "designed to mislead, or that [were] made in reckless disregard of whether they would mislead, the magistrate."  Id. at 301 (internal emphasis omitted). In other words, the false statement or omission must be "the product of a deliberate falsehood or of reckless disregard for the truth."  Id. (quoting Franks, 438 U.S. at 171) (internal quotation marks omitted).

And, of course, "to violate the Constitution, the false statements or omissions must be 'material,' that is, 'necessary to the neutral and disinterested magistrate's finding of probable cause.'"  Miller, 475 F.3d at 628 (internal alteration omitted). A determination of materiality is made by excising "the offending inaccuracies and insert[ing] the facts recklessly omitted, and then determin[ing] whether or not the 'corrected' warrant affidavit would establish probable cause."  Id. (internal quotation marks omitted).

Falsity is self-explanatory.  Reckless disregard

> can be established by evidence that an officer
> acted with a high degree of awareness of a
> statement's probable falsity[;] that is, when
> viewing all the evidence, the affiant must
> have entertained serious doubts as to the
> truth of his statements or had obvious reasons
> to doubt the accuracy of the information he

27

> reported. With respect to omissions,
> 'reckless disregard' can be established by
> evidence that a police officer failed to
> inform the judicial officer of facts he knew
> would negate probable cause.

Id. at 627 (internal citations, quotation marks, and alteration omitted).

### 3. Probable Cause

Probable cause is a "commonsense, nontechnical" concept that deals "with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Ornelas v. United States, 517 U.S. 690, 695 (1996) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)) (internal quotation marks omitted). Probable cause is determined by a "'totality-of-the-circumstances' approach." Smith v. Munday, 848 F.3d 248, 253 (4th Cir. 2017). "An officer has probable cause for arrest when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense." Burrell v. Virginia, 395 F.3d 508, 514 (4th Cir. 2005) (quoting Wilson v. Kittoe, 337 F.3d 392, 398 (4th Cir. 2003)) (internal quotation marks and alteration omitted). When determining whether probable cause exists in a given case, a court must "limit [its] consideration to only those facts and circumstances known to the officer at the time of the arrest." Wilson, 337 F.3d at 398 (quoting Smith v. Tolley, 960 F.

Supp. 977, 994 (E.D. Va. 1997)) (internal quotation marks and alteration omitted).

It is well to recall that offenses "consist of the essential elements of the crime." United States v. Brown, 119 Fed. App'x 494, 498 (4th Cir. 2005) (quoting United States v. Harris, 128 F.3d 850, 854 (4th Cir. 1997)) (internal quotation marks omitted). And, it is settled that a "criminal law provision is made up of material elements. These are the pieces of the crime, each of which must be proven beyond a reasonable doubt to the fact finder in the case." Jens David Ohlin, Criminal Law: Doctrine, Application, and Practice 20 (2d ed. 2018) (internal emphasis omitted). Furthermore, the Due Process Clause requires the prosecution to prove beyond a reasonable doubt each element of the offence. Patterson v. New York, 432 U.S. 197, 215 (1977) (noting that Supreme Court "held that a State must prove every ingredient of an offense beyond a reasonable doubt, and that it may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense"); see also Kevin F. O'Malley, Jay E. Grenig, & Hon. William C. Lee, Fed. Jury Practice & Instructions 161 (6th ed. 2008) ("The burden is always upon the prosecution to prove guilt beyond a reasonable doubt.").

To support issuance of a warrant for arrest, "[e]vidence sufficient to secure a conviction is not required, but probable cause exists only if there is sufficient evidence on which a

reasonable officer at the time could have believed that probable cause existed for the arrest." Hupp v. Cook, 931 F.3d 307, 318 (4th Cir. 2019). In other words, "[p]robable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." Sennett v. United States, 667 F.3d 531, 535 (4th Cir. 2012) (quoting Adams v. Williams, 407 U.S. 143, 149 (1972)) (internal quotation marks omitted). Nonetheless, it is necessary to "examine the elements of [the given] crimes and determine whether a reasonable officer could believe, in light of the contours of the offense at issue, that probable cause exists to arrest that person." Guerrero v. Deane, 750 F. Supp. 2d 631, 651 (E.D. Va. 2010) (quoting Rogers v. Pendleton, 249 F.3d 279, 290 (4th Cir. 2001)) (internal quotation marks omitted). Put differently, "to determine whether [the officer] had probable cause to lawfully arrest [the accused], a reviewing court necessarily must relate the events leading up to the arrest to the elements of the offense that [the officer] believed was being or had been committed." Hayes v. City of Seat Pleasant, 469 Fed. App'x 169, 172 (4th Cir. 2012); see also Rogers v. Stem, No. 1:12-cv-976, 2013 WL 3338651, at *5 (E.D. Va. July 2, 2013) (discussing how probable cause assessments "must be made within the context of the specific offense under consideration, which requires this Court to consider centrally the elements of the crimes charged.").

In sum, it is beyond question that a showing of probable cause requires some support for every element of the charged offense.

In this case, the arrest was for a violation of Virginia's malicious wounding statute, found in § 18.2-51 of the Code of Virginia. That statute provides:

> If any person maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill, he shall, except where it is otherwise provided, be guilty of a Class 3 felony. If such act be done unlawfully but not maliciously, with the intent aforesaid, the offender shall be guilty of a Class 6 felony.

Va. Code § 18.2-51.[15]

The text of Va. Code § 18.2-51 is that the wounding must be accomplished with "the intent to maim, disfigure, disable, or kill," and the Supreme Court of Virginia has made clear that "[t]o be guilty of malicious wounding, a person must also intend to permanently, not merely temporarily, harm another person." Burkeen v. Commonwealth, 286 Va. 255, 259 (2013) (quoting Johnson v. Commonwealth, 53 Va. App. 79, 101 (2008)) (internal quotation marks and alterations omitted) (emphasis added);[16] see also Dawkins

_____

[15]    Whitehead's discussion of the statute makes no mention of the "permanently" requirement.

[16]    Indeed, this requirement that the defendant intend to "permanently" harm another person is so well-established that Virginia's Model Jury Instructions state explicitly that the prosecution must prove beyond a reasonable doubt that the wounding "was with intent to kill or permanently maim, disfigure, or

31

v. Commonwealth, 186 Va. 55, 62 (1947) (noting that "actions of the defendant in breaking the nose of [the victim], and particularly in kneeing his genital organs, were actions peculiarly calculated to disfigure, or disable, and permanently disable"); Lee v. Commonwealth, 135 Va. 572, 578 (1923) (explaining that "disfigure" means permanent disfigurement); Johnson, 53 Va. App. at 101 (requiring intent to permanently harm); Campbell v. Commonwealth, 12 Va. App. 476, 484 (1991) (noting that "[t]he word 'disfigure' means a permanent and not merely a temporary and inconsequential disfigurement. Similarly, the word 'disable' must refer to a permanent, not a temporary, disablement." (quoting Lee, 135 Va. at 578) (internal citation and quotation marks omitted)).

In order to prove that a person committed a malicious wounding, therefore, the Commonwealth must prove that the person: (1) caused, (2) a wound or bodily injury, (3) maliciously, and (4) with the intent to kill or to permanently maim, disfigure, or disable. Virginia Model Jury Instructions—Criminal, No. 37.100 (2016). Here, there is no intent to kill alleged or argued. And, the other element of intent is not satisfied without proof that the intent was to "permanently maim, disfigure, or disable."

disable." Virginia Model Jury Instructions—Criminal, No. G37.100 (2016).

**B.  Whitehead's Motion for Summary Judgment**

Whitehead makes two arguments that she says warrant granting summary judgment in her favor.  Each will be addressed in turn.

### 1.  Probable Cause

First, Whitehead argues that she "did not violate Plaintiff's constitutional rights because, as a matter of law, she had probable cause to believe that a crime was committed at the time she petitioned for a warrant for Plaintiff's arrest."  (DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, ECF No. 46 ("Defendants' Opening Brief") at 1.)  According to Whitehead, "The Undisputed Facts Demonstrate that Probable Cause Existed for Plaintiff's Arrest."  (Id. at 14.)  And, to understand Whitehead's theory, it is useful here to recite in detail Whitehead's rationale for that assertion.  Whitehead's brief thus says that:

> During the course of the Initial Investigation, Officer Whitehead received the following information from the witnesses and participants:
>
>   1.  Following an argument, [Bonnell] threated to hit Phillips in the head with a bottle.
>
>   2.  No more than a minute later, [Bonnell] threw a glass wine bottle at Phillips, but missed and struck Sutliff in the head.
>
>   3.  The wine bottle injured Sutliff, causing a wound that produced a substantial amount of blood.
>
> These three facts address the ·elements required to prove a malicious wounding.

33

> First, [Bonnell's] throwing of the bottle was
> an intentional act causing bodily injury to
> another.   Second, Sutliff's injuries were
> consistent with a "wound" as they involved a
> break of the skin, or of the skin and flesh.
> Finally, [Bonnell's] threat to use the bottle
> as a weapon against Phillips, only moments
> before [Bonnell] attempted to do so, provided
> evidence of intent and malice.

(Id. at 14-15 (internal citations, quotation marks, and alteration
omitted).)

The first problem with Whitehead's argument is that, even if
the issue of misrepresentations and omissions is ignored and even
if the "maliciously" element of the crime can be said to have
support in the Criminal Complaint, the argument itself ignores
another crucial element of the alleged crime: with intent to
permanently maim, disfigure or disable.   Va. Code § 18.2-51;
Virginia Model Jury Instructions-Criminal, No. G37.100 (2016).
Although Whitehead's formulation does mention the word "intent" in
passing, it is telling that her brief does not address the
"permanently" requirement that is embedded in Virginia law.
Moreover, none of the evidence Whitehead cites as sufficient for
probable cause of "intent and motive" actually supplies evidence
that Bonnell acted with intent to permanently maim, disfigure, or
disable.  That specific intent is an essential element of malicious
wounding and without a showing on that element, a neutral
magistrate could not find probable cause for the crime as it is
defined in the charged statute, Va. Code § 18.2-51.

Any warrant devoid of support for an element lacks probable cause to believe that the charged offense was committed because, unless there is evidence to support a conclusion that the accused committed each element, there is no probable cause to believe that the accused committed the crime that is charged.[17] Where, as here, the Criminal Complaint does not contain any evidentiary support for the specific intent element (with intent to permanently maim, disfigure, or disable), the warrant cannot be based on probable cause.[18] Certainly, the record would permit a reasonable jury to decide that the Criminal Complaint is lacking such evidence.

But even if Whitehead's argument is accepted, it would not carry the day because Bonnell's claim in COUNT I is that Whitehead deliberately or with reckless disregard for the truth made material misrepresentations in, and omitted material information from, the Criminal Complaint. And, Whitehead's probable cause argument simply ignores the significant record evidence on that point. A

---

[17] All probative evidence of the element need not be put forward, but that does not mean that each element need not be supported by some evidence that goes to prove it.

[18] Whitehead fastens on the phrase in the Complaint asserting that Whitehead "purposefully concealed important and material facts regarding the incident, including, but not limited to, Mr. Bonnell's action in self-defense." Whitehead then devotes much argument to whether an arresting officer must take into account an affirmative defense of self-defense in assessing probable cause. Bonnell's response extensively rebuts that contention. Although Whitehead likely is right on that narrow question, it is beside the point on which she rests the probable cause component of the Motion: that she had probable cause.

review of the video from the body cameras and the statements of those with firsthand knowledge would permit a reasonable jury to find that the alleged misrepresentations and omissions occurred; that they were material to a finding of probable cause; that probable cause did not exist; and that the misrepresentations and omissions were made intentionally and with reckless disregard for the truth. If that evidence is accepted as true by the jury, Bonnell will prevail on COUNT I wholly apart from whether the Criminal Complaint on its face shows probable cause to believe that Bonnell committed the crime of malicious wounding under Virginia law.

Whitehead takes the positions that there were no misrepresentations made, and that, even if there were misrepresentations, neither they nor the omissions were material to a finding of probable cause. But, as discussed below, the factual misrepresentations and the omissions, individually and collectively are pertinent to whether Bonnell acted with malice or whether he acted with the intent to permanently maim, disfigure, or disable. Those are two separate and important elements of the offense of malicious wounding. It is up to the jury to decide whether those misrepresentations or omissions were made, whether

they were material,[19] and whether there was probable cause when the misrepresentations are excised from, and the omissions are inserted in, the Criminal Complaint.

### (a) The Alleged Material Misrepresentations and Omissions

In making that analysis, it is important to keep in mind what Whitehead said, and did not say, in the Criminal Complaint:

> Accused was involved in a physical altercation with a suite-mate. During the altercation, accused was thrown to the ground and upon standing he grabbed a glass liquor bottle. He threw this bottle at the subject he was fighting but missed him, striking a nearby female in the head causing her to black out. Female has a large hole in the back side of her skull. Minutes before the altercation started, the accused told the female that was hit that he "wished he could throw a bottle @ his head" referring to the subject he was involved in the altercation with.

(ECF No. 46-14 at 3.)

And, it is important to recall the misrepresentations and omissions. The misrepresentations were: (1) that Bonnell was standing when he threw the bottle; (2) that Sutliff blacked out; and (3) that Sutliff had a "large hole in the back side of her skull." (ECF No. 1 at ¶ 48.) The omitted material information was that: (1) Phillips, who was considerably larger than Bonnell, was, according to all the evidence (except Phillips' statement)

---

[19]    If materiality were a question of law, the record convinces the Court that the misrepresentations and omissions were indeed material.

37

the aggressor in the altercation (he followed Bonnell into Sutliff's suite and pushed Sutliff aside to get to Bonnell); (2) Phillips initiated the physical contact between the two, and Bonnell was "laying on the floor motionless"; (3) Phillips picked him up by his legs and threw him to the floor again; (4) Phillips confirmed that Bonnell was "on the ground" when Bonnell "picked up the bottle next to him and attempted to throw it at [Phillips]"; and (5) Bonnell was injured by Phillips. (ECF No. 51-11.)

Excising the "offending inaccuracies and insert[ing] the facts recklessly omitted" from the Criminal Complaint, Miller v. Prince George's Cty., 475 F.3d 621, 628 (4th Cir. 2007), leads to the following:

> Accused was involved in a physical altercation with a suitemate. **The suitemate followed the accused from a hall into the place where the physical contact occurred, and pushed aside a person who tried to keep him away from Bonnell, the accused. The suitemate initiated the physical altercation by grabbing the accused by the neck and throwing him to the floor. At this point, the suitemate, who was larger than the accused, picked up the accused, who was lying on the floor motionless, and slammed him down again.** During the altercation, accused was thrown to the ground and ~~upon standing~~, **while attempting to stand up,** he grabbed a glass liquor bottle. He threw this bottle at the subject he was fighting but missed him, striking a nearby female in the head ~~causing her to black out. Female has a large hole in the back side of her skull.~~ **The suitemate confirmed that the accused was still on the ground when he threw the bottle. The accused suffered a laceration to the back of his head, a mild concussion,**

38

**and substantial bleeding from the attack.**
Minutes before the altercation started, the
accused told the female that was hit that he
"wished he could throw a bottle @ his head"
referring to the subject he was involved in
the altercation with.

(ECF No. 46-14 at 3 (strikethroughs and bolded text added).)

Each alleged misrepresentation and omission will be addressed
in turn.

### (i) The "Upon Standing" Misrepresentation and "Getting Up" Omission

Because the alleged misrepresentation and the omission are
related, they will be addressed together.  As noted above, there
is no real dispute that Bonnell was either on the ground, or was
on the ground attempting to stand up, when he threw the bottle at
Phillips.  (ECF No. 51-10 at 1 (Bonnell's written statement that
he threw bottle "[w]hile [he] was trying to get up"); ECF No. 51-
11 at 1 (Phillips' written statement that Bonnell threw it "[w]hen
he was on the ground"); ECF No. 51-12 at 1 (Sutliff's statement
that Bonnell threw bottle "as he was getting up, in the fight").)
Both Sutliff, the victim, and Phillips, the aggressor, agree that
Bonnell was still on the ground when he threw the bottle.  (ECF
No. 51-11 at 1 (Phillips' written statement that Bonnell threw it
"[w]hen he was on the ground"); ECF No. 51-12 at 1 (Sutliff's
statement that Bonnell threw bottle "as he was getting up, in the
fight").)  Therefore, Whitehead's statement that Bonnell threw the
bottle "upon standing" was a misrepresentation, and her failure to

state that Bonnell was on the ground, or on the ground attempting to stand, was an omission.

The question thus becomes whether a jury could find that this misrepresentation and omission were material—*i.e.*, whether this misrepresentation and omission were necessary to the Magistrate's finding of probable cause. And the answer is clearly yes. Malicious wounding requires, among other things, both malice and the specific intent to permanently maim, disfigure, disable, or kill. See, e.g., Burkeen v. Commonwealth, 286 Va. 255, 259 (2013); Virginia Model Jury Instructions—Criminal, No. G37.100 (2016); see also Va. Code § 18.2-51. The image of Bonnell throwing a bottle after standing completely upright might, at a stretch, be considered as evidence of malice. In contrast, Bonnell throwing a bottle at his assailant while attempting to pick himself up from the ground during Phillips' continued attack would permit the Magistrate to find that Bonnell acted in response to provocation, which is not malice. Also, with the correct facts, the Magistrate certainly could, and likely would, conclude that Bonnell's sole intent at that moment was to protect himself from Phillips' continued attack, not to kill or permanently maim, disfigure, or disable Phillips.

The finder of fact reasonably could find that, when the "upon standing" misrepresentation is deleted from, and the "getting up" omission is inserted in, the Criminal Complaint, a neutral

magistrate would not find probable cause because of an absence of evidence of malice and/or the absence of evidence of the specific intent to permanently maim, disfigure, or disable.

Finally, it is necessary briefly to address the parties' lengthy arguments about whether the facts (had they been accurately presented to the Magistrate) prove self-defense and whether Whitehead was required to so apprise the Magistrate. That argument is of no real moment because the same facts that can give rise to the affirmative defense of self-defense are also material to whether there is evidence to support the malice and specific intent elements of the charged crime. In other words, wholly apart from the briefing on self-defense, the issue is: with the misrepresented facts out of, and the omitted facts in, the Criminal Complaint, would the Magistrate have concluded that there was probable cause to support the malice and specific intent elements of malicious wounding? The record here convinces that a reasonable jury could (indeed, likely would) answer that query in the negative.

### (ii) The Misrepresentation of Sutliff's Injuries

Whitehead's Criminal Complaint also stated that Sutliff "black[ed] out" and had a "large hole in the back side of her skull." (ECF No. 46-14 at 3.) Nothing in the summary judgment record shows that there is any truth to either representation.

Sutliff herself stated that she had a "split" in her head (not a large hole in the back of her skull), and neither Sutliff nor any other witness stated that she blacked out for any period of time.[20] (See, e.g., ECF No. 51-12 at 2 (Sutliff's written statement explaining that she "started bleeding from the split in [her] head"); ECF No. 51-10 (not stating that Sutliff blacked out); ECF No. 51-11 (same).)

In misrepresenting Sutliff's injuries, Whitehead offered evidence addressed to the element of whether Bonnell had acted with the intent to permanently maim, disfigure, or disable. And, on that point, it is important to recall that, at the outset of the investigation, it was upon seeing a picture of Sutliff's wound that Whitehead declared, "that's malicious wounding." Clearly then, she considered the description of the wound to be material to the charge that she was making. And, a reasonable magistrate's determination of probable cause would be affected by knowing that Sutliff's wound was a minor one that did not require stitches, rather than one that caused her to "black out" and that was a "large hole in the back of her skull," neither of which was either

---

[20]    Sutliff did say that Lantz woke her up from her sleep every thirty minutes or so throughout the night to make sure there were no signs of concussion.    But, that is not evidence that Sutliff "blacked out."

true or supported by the recorded interviews or written statements of the witnesses who had firsthand knowledge.

Additionally, the fact that these misrepresentations were made is relevant to whether Whitehead made other misrepresentations or omissions deliberately or with reckless disregard for the truth.[21]

### (iii) The Omissions that Phillips, Who Was Larger than Bonnell, Was the Aggressor and Started the Physical Altercation

Bonnell also takes the view that Whitehead's omissions that Phillips was larger than Bonnell, was the primary aggressor, and was the person who initiated the physical contact are material. Because they are related, all three omissions will be addressed together. It is undisputed that Phillips was larger than Bonnell. (See Trans. BWC Video 1, 16:8-14.) On its own, this omission is likely not material because Phillips and Bonnell's relative sizes are not inherently relevant to the malice and specific intent elements of the charged crime.

However, the fact that Phillips was plainly the aggressor is material to both elements of malicious wounding. After Bonnell withdrew from the verbal exchange in his suite, Phillips chose to pursue Bonnell down the hall and into Sutliff's suite. And, he

---

[21] This issue is discussed in more detail *infra* at Section III(B)(1)(b): Whitehead's State of Mind.

did so with aggression because the record shows that Phillips "pushed [Sutliff] out of the way to get to [Bonnell]." (ECF No. 51-12 at 1.) That Bonnell was reacting to Phillips' aggression could cause a reasonable magistrate to doubt that Bonnell acted with malice, or with the intent to permanently maim, disfigure, or disable. Certainly a reasonable jury could make such a finding based on the record.

Moreover, the record shows that Phillips initiated the physical contact. Indeed, by his own admission, Phillips made the extreme decision to "use[] [his] left hand and push[] [Bonnell] into the locker around the neck still holding him there" before "[throwing] him to the ground." (ECF No. 51-11 at 1.) Still not content, Phillips picked Bonnell up and threw him to the ground again. (ECF No. 51-10 at 1.) Any reasonable magistrate could have, and likely would have, concluded that, when he threw the bottle (while on the ground, as Phillips said, or trying to get up from the ground, as Sutliff said), Bonnell was in the middle of a violent attack (made by a bigger man) and that Bonnell was reacting to Phillips' continuing attack (hurling Bonnell to the floor). A jury reasonably could find that this omission was thus also material because it is highly probative of the elements of malice and the specific intent required by Va. Code § 18.2-51 and Virginia decisional law.

### (iv) The Omission that Bonnell Was Injured

Bonnell also argues that the omission of his laceration, concussion, and substantial bleeding was also material. Bonnell's injuries are probative of the fact that he acted with provocation, which is the antithesis of acting with malice under Virginia law.

### (v) Cumulative Effect

Removing and inserting, respectively, the asserted misrepresentations and omissions makes clear to the Court that a neutral magistrate, upon seeing the revised Criminal Complaint, certainly could have found that there was no probable cause to arrest Bonnell on a charge of malicious wounding because of the absence of evidence on two key elements of that crime. And certainly a reasonable jury could reach the same conclusion.

Whitehead argues that these misrepresentations and omissions are not material and that, even with those facts before him, the Magistrate would have found probable cause for a malicious wounding charge. It is somewhat difficult to understand why Whitehead thinks that is so. Nonetheless, those are issues for the jury and that precludes summary judgment on Whitehead's theory that there was probable cause for the arrest.

### (b) Whitehead's State of Mind

Finally, resolution of Whitehead's motion for summary judgment must take into account that, for Bonnell to prevail, he must prove, by a preponderance of the evidence, that Whitehead

45

made the misrepresentations and omissions intentionally or with reckless disregard for the truth. Whitehead's state of mind is the quintessential jury issue. That is particularly so on this record. And, there is evidence from which a jury could conclude that Whitehead procured Bonnell's arrest by intentionally (as defined in United States v. Colkley, 899 F.2d 297, 300-01 (4th Cir. 1990)) or with reckless disregard for the truth misrepresenting and/or omitting material facts.

There is evidence that, with no basis in fact, Whitehead judged Bonnell to be a liar ("getting ready to lie"). A jury could take that into account in deciding Whitehead's state of mind.

There is evidence that, when her investigation was scarcely underway, Whitehead took a quick look at a photograph of Sutliff's injury and immediately declared, "this is malicious wounding." That is remarkable considering that the crime she had in mind cannot be committed absent proof of malice and proof of the specific intent to permanently maim, disfigure, or disable. At the time that Whitehead fastened upon that conclusion, she had no evidence at all on those key elements. A jury could consider those facts in deciding whether Whitehead made deliberate misrepresentations and omissions or made them with reckless disregard for the truth to vindicate the snap judgment she made at the very beginning of her investigation.

There is evidence that Whitehead made utterly unfounded statements about Sutliff's injury (that she "blacked out" and had "a hole in her skull"). There is evidence that, in the Incident Report and in the Criminal Complaint, Whitehead entirely misrepresented what Phillips had told her (twice) and the RA about who initiated the actual physical contact. That too is evidence of the requisite state of mind.

Additionally, the substantive significance of the misrepresentations and omissions on important points is probative of Whitehead's state of mind. A jury reasonably could find that those misrepresentations and omissions on such serious elements of the crime are proof of intentional misrepresentation and willful disregard. Where, as here, an officer, without any evidence, adjudges a suspect as a liar and, when the investigation is just under way, jumps to the conclusion that a crime has been committed without evidence on two key elements of that crime, the fact that the officer made misrepresentations and omissions on the key substantive issues could be considered as evidence both of intent to mislead the magistrate and of reckless disregard for the truth of the evidence known to the officer.

It is, of course, correct that Whitehead has offered evidence that, according to her, counters the evidence of misrepresentation and omission, as well as evidence that cuts in her favor on her

47

state of mind. But the resolution of conflicting evidence is for the jury, not for the Court on summary judgment.

For the foregoing reasons, Whitehead's MOTION FOR SUMMARY JUDGMENT on the theory that there was probable cause for the arrest on COUNT I must be denied.

### 2. Qualified Immunity

The second ground upon which Whitehead seeks summary judgment is qualified immunity.[22] The legal framework for analyzing a qualified immunity defense is well-settled. That framework may be summarized as follows.

"Law enforcement officers are entitled to qualified immunity from § 1983 liability arising from their official discretionary acts that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Smith v. Reddy, 101 F.3d 351, 355 (4th Cir. 1996) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)) (internal quotation marks omitted). When "resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." Tolan v. Cotton, 572 U.S. 650, 655-56 (2014)

---

[22] (Defendants' Opening Brief at 21-27.) And, all of Whitehead's reply brief is devoted to that topic. (DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, ECF No. 52.)

(quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)) (internal quotation marks and alterations omitted). The second asks "whether the right in question was 'clearly established' at the time of the violation . . . Courts have discretion to decide the order in which to engage these two prongs." Id. at 656. However, "under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment" because, as in any summary judgment motion, courts must interpret the facts in the light most favorable to the opposing party. Id. at 656–57.

### (a) Violation of Constitutional Right

Bonnell, like all citizens, is entitled to the benefit of the rule that the Fourth Amendment to the United States Constitution protects citizens from seizure, for example by arrest, when the complaining law enforcement officer has secured an arrest warrant by making material misrepresentations of fact to, or withholding key information from, the neutral magistrate or by acting with willful disregard of the truth. See United States v. Leon, 468 U.S. 897, 923 (1984); Franks v. Delaware, 438 U.S. 154, 171–72 (1978); Massey v. Ojaniit, 759 F.3d 343, 354–57 (4th Cir. 2014); Evans v. Chalmers, 703 F.3d 636, 647–48 (4th Cir. 2012). The claim in COUNT I is that Whitehead violated that right by securing Bonnell's arrest by making intentional misrepresentations of material fact and omitting material facts in willful disregard of the truth.

This asserted claim necessitates a determination "whether the facts, taken in the light most favorable to [Bonnell], show the officer's conduct violated a federal right." Tolan v. Cotton, 572 U.S. 650, 655-56 (2014) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)) (internal quotation marks and alterations omitted). For the purposes of this analysis, the facts are those known to the officer and the facts that were willfully disregarded.

For the reasons discussed in Sections I and III above, a jury could reasonably find that Whitehead procured Bonnell's arrest by intentionally making, in the Criminal Complaint,[23] misrepresentations of fact and/or by omitting facts in willful disregard of the truth; that the misrepresentations and omissions were material because they pertained to two key elements of the crime of malicious wounding (malice and specific intent); and that, in so doing, Whitehead acted intentionally and with reckless disregard for the truth of known or readily knowable facts.

Whitehead intends to offer evidence on this state of mind facet of the claim. And, it may well be that a jury will take her view of things. However, that call is for the jury to make and may not be made by the Court on summary judgment on the ground of qualified immunity.

---

[23] And, in the Incident Report if it was shown to the Magistrate.

Whitehead also intends to offer evidence or argument that the misrepresented facts and the omissions were not material to a determination of probable cause. The Court is dubious of her ability to do so successfully, but again the decision on that question rests with the jury.

> **(b)  It Is Clearly Established Law that Officers Cannot Make Material Misrepresentations or Omissions Deliberately or with a Reckless Disregard for the Truth When Seeking Warrants**

The second prong of the qualified immunity inquiry asks "whether the right in question was 'clearly established' at the time of the violation." Tolan v. Cotton, 572 U.S. 650, 656 (2014). "The law [is] unquestionably clearly established . . . that the Constitution [does] not permit a police officer deliberately, or with reckless disregard for the truth, to make material misrepresentations or omissions to seek a warrant that would otherwise be without probable cause." Miller v. Prince George's Cty., 475 F.3d 621, 632 (4th Cir. 2007). Indeed, since before the turn of the century, it has been clear that "a reasonable officer cannot believe a warrant is supported by probable cause if the magistrate is misled by statements that the officer knows or should know are false." Id. (quoting Smith v. Reddy, 101 F.3d 351, 355 (4th Cir. 1996)) (internal quotation marks omitted).

Whitehead's argument that she is still "entitled to qualified immunity because it was not clearly established . . . that

information related to self-defense was material to an officer or magistrate's evaluation of the question of probable cause" is unpersuasive. (See Defendants' Opening Brief at 26.) The right at issue is not the right to have an officer or magistrate consider information related to self-defense. The right in question here is the right to not have law enforcement officers make material misrepresentations or omissions deliberately or with a reckless disregard for the truth when seeking a warrant for arrest, which is precisely the right about which both the Supreme Court and Fourth Circuit have spoken definitively long before this event occurred.

### (c) That the Magistrate Issued the Warrant Does Not Shield Whitehead from Liability

"[C]onstitutional torts, like their common law brethren, require a demonstration of both but-for and proximate causation. Accordingly, subsequent acts of independent decision-makers . . . may constitute intervening superseding causes that break the causal chain between a defendant-officer's misconduct and a plaintiff's unlawful seizure." Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012) (internal citations omitted). However, the fact that a magistrate issued the warrant does not "eliminate [an officer's] responsibility for the natural consequences of his use of intentionally or recklessly false material misstatements and omissions to obtain the arrest warrant." See Miller v. Prince

George's Cty., 475 F.3d 621, 630 (4th Cir. 2007); see also United States v. Leon, 468 U.S. 897, 923 (1984) ("Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth.").

If it is decided that Whitehead intentionally or with reckless disregard for the truth made material misrepresentations in and/or omitted material information from the Criminal Complaint, the fact that the Magistrate issued the warrant based on that Criminal Complaint will not afford Whitehead the shield of qualified immunity.

**CONCLUSION**

For the foregoing reasons, the MOTION FOR SUMMARY JUDGMENT (ECF No. 45) will be denied with respect to Whitehead and denied as moot with respect to Beach.

It is so ORDERED.

/s/   _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: October __3__, 2019